MAYER GODCHAUX CO., INC., v. REGAN

——.

(November 16, 1931.   Opinion and Decree.)
(December 14, 1931.   Rehearing Refused.)

——

Pomes & McCabe, of New Orleans, attorneys for plaintiff, appellee.

Frymire & Ramos, R. R. Hagen and C. L. Stiffell, of New Orleans, attorneys for defendant, appellant.

HIGGINS, J. This is a suit on a written contract to recover the sum of $641.02 for furnishing, installing, and servicing certain equipment in connection with the heating system in defendant's premises. The contract and itemized statements are annexed to and made part of the petition. The defenses are:

(1) That the original boiler, which was furnished and installed by the plaintiff, exploded on account of incompetent and inefficient services in examining the heating system, and incorrect and poor workmanship in repairing it, and therefore the plaintiff was legally bound to furnish another boiler and repair the damage without cost to defendant.

(2) In the alternative, that the new boiler furnished by the plaintiff is inadequate to heat the apartment, having only one-half of the heating capacity of the original one.

(3) Further in the alternative, that the installation of the new boiler and repairs to the heating system were so defective that repairs and replacements by other mechanics became necessary, and, hence, defendant is entitled to an allowance for these expenses.

(4) Finally in the alternative, that the plaintiff is not entitled to recover for the service charges, because these items were the result of their own faulty workmanship originally.

There was judgment for the plaintiff as prayed for, and the defendant has appealed.

The record shows that the defendant is a femme sole and owned an apartment building consisting of ten apartments. On July 28, 1926, she entered into a written contract with the plaintiff, which is engaged in furnishing and installing heating equipment, for the installation of a complete automatically operated heating system. This system was installed in accordance with the plans and specifications prepared by M. A. Cooper, a practical engineer, who drew the plans and specifications for the defendant. In connection with the heating system, there was installed a Utica super smokeless boiler, size S-337, containing eight sections. Under the written contract, the plaintiff guaranteed the materials and workmanship for a period of one year. The heating system operated properly and without complaint until November, 1928, when the defendant requested the plaintiff to service and inspect the system, which was done at a cost of $28.30. Some time between December 10, and 15, 1928, the defendant complained to plaintiff that the system was not working properly, and it was again inspected and placed in working order. In the evening of December 19, 1928, a fuse, or soft plug, placed in the boiler for the purpose of preventing the cracking or exploding of the boiler, melted and caused the apparatus to cease functioning. On the morning of December 20, 1928, defendant notified the plaintiff, which sent its mechanic, who placed a new fuse plug in the boiler and pronounced it in good working order at 3:30 p. m. the same day. About 9:00 o'clock the same evening, the defendant and her brother noticed that the radiators were making noise, as if some one were hammering on them, and, upon telephoning plaintiff, they were requested to release the pet cock to get the air out of the pipes. The next morning, December 21, 1928, defendant arose early and turned on the

thermostat, which caused the heating system to operate, and, after functioning all right for over an hour, at about 7 o'clock there was an explosion, which caused four of the eight sections of the boiler to crack. The plaintiff was again called in, and its mechanics commenced dismantling the boiler. On the same day, plaintiff submitted, in writing, an estimate of the cost of either replacing the cracked sections of the boiler, or furnishing a new one, and the defendant, having decided on the installation of a new boiler, plaintiff's workmen proceeded with the dismantling and taking out of the old boiler. On Saturday afternoon, December 22, 1928, about 3 o'clock, another written estimate was submitted to the defendant, which contained the following stipulation:

"If the above is acceptable to you, it is understood that payment is to be made on our regular basis, cash upon completion, and in this connection, we are released of all responsibility relative to the damage done to your former system."

Defendant also signed this agreement. The work was completed, and the heating system placed in working order again by Sunday afternoon, December 23, 1928. It appears that thereafter the defendant again called upon the plaintiff for services in connection with the heating apparatus, and also upon other mechanics for the relining of the fire box with bricks, and the repairing of certain electrical connections and the condensation pump. The defendant refused to pay the plaintiff the bills in question, claiming that the new work was necessary because of the negligence and carelessness of its employees in improperly repairing and inspecting the boiler and heating system prior to the explosion.

Taking up the defenses in the above order, we observe that the plaintiff offered evidence tending to prove that the original boiler and system were properly installed and functioned efficiently and effectively for two years, except for minor adjustments and repairs; that the inspection and repairs during November and December, 1928, were competently carried out, and that the heating system was in good order and giving satisfactory service, as no complaints were made.

The defendant then offered evidence tending to show that the mechanic who repaired the condensation pump had put a nail in the shaft connection, instead of a cotter pin, and that, on account of vibration, the nail became dislodged, causing the connection to be severed and the pump to stop; that, as a result of the condensation pump stopping, the water was not pumped back into the boiler, which caused it to become overheated and resulted in the fuse or soft plug blowing out, or melting, thereby causing the entire system to stop functioning; that, upon the furnishing and installing of a new fuse plug, the system was again pronounced in working order by the plaintiff's mechanics, and that there was not any interference on the part of defendant, or any one in the apartment, with the operation of the heating system, until the explosion, when the janitor simply turned off the electric switch in order to prevent further damage.

The plaintiff then offered the testimony of its office manager and of its mechanic who installed the boiler, both of whom testified that the defendant, on December 21, 1928, stated to them that the sections of the boilers were cracked, because the negro janitor introduced cold water into the boiler, while it was overheated. The defendant and the janitor both deny the alleged conversation, and also that any cold water was put into the boiler. The defendant's version of the cause of the explosion is that the condensation pump did not function, resulting in the water being

eliminated from the boiler, and thereby causing the explosion.

The experts of both the plaintiff and the defendant are in agreement that the fuse, or soft plug, is a safety device for the purpose of preventing a boiler from exploding, as the plug would melt and cause the fire to go out and the heating system to stop functioning. They are also in agreement that the failure of the condensation pump to function would not cause the boiler to explode or crack, but would simply cause it to become overheated. The expert for the defendant stated that the introduction of either hot or cold water would cause the boiler to crack while in such a condition, and the experts for the plaintiff testified that only the placing of cold water in the boiler under the circumstances would cause it to crack or explode. It is therefore clear that the cause of the explosion could not have been the failure of the condensation pump to properly function, as this is agreed to by the experts on both sides.

It further appears to us that the preponderance of the evidence, on the issue of whether or not the janitor put cold water in the boiler by opening the valve, is with the plaintiff, because two witnesses for the plaintiff stated that the defendant assigned this as the reason for the explosion, and they are corroborated by the fact that the defendant signed two written agreements with the plaintiff to pay for the installation of the new boiler, and, in the second one, specifically released the plaintiff of all responsibility for damages caused by the original boiler exploding.

The defendant urged that she signed both of the contracts under duress, because the plaintiff had the plans and specifications by which the heating system was installed in the apartment; that the weather was very cold at the time, being below 50 degrees Fahrenheit; that her tenants in the apartment were complaining of coldness and threatened to move, unless adequate heat was immediately furnished, and that the plaintiff was the only heating contractor in the city which could immediately make the necessary repairs.

We think it sufficient to dispose of this argument by saying that the experts for both parties litigant again were in agreement; that there were several other establishments in New Orleans in this line of business, which could have furnished the required services and equipment to restore the heating system to mechanical order. Furthermore, the defendant testified that, at the time she signed these two agreements, the representative of the plaintiff told her that she could get some one else to do the work, if she so desired, and that no attempt was made by the plaintiff's representative to force their services on her. We conclude that the first defense must fall.

As to the second defense, that the new boiler did not produce sufficient heat to make the apartment comfortable, we have the testimony of the president of the plaintiff company, who testified that the new boiler was furnished by the International Heater Company, which had been in business for 88 years, and that after the installation they had received no complaints from the defendant that the boiler was not producing sufficient heat. He is corroborated by two members of his office force, who testified that no complaints were received from the defendant on this score. Three engineers connected with the International Heater Company, which manufactured the new boiler, were qualified as experts of proper technical training and experience, and testified that the boiler

was guaranteed by the manufacturer to have radiation of 1,710 square feet, which guarantee was still effective in favor of both the plaintiff and the defendant, in the event that the boiler fails to produce that amount of heat. The testimony of two of these experts was taken by deposition, but the third was produced in court, and he stated that, at the request of the plaintiff, he had examined the premises in question and that the boiler was adequate to produce sufficient heat in the premises.

On this defense, the defendant offered the testimony of two experts, the first of whom said that, the calculation of two of the experts in the research department of the manufacturer of the boiler having been based upon engineering data, he would not take issue with them. The other expert stated that he was not a graduate, but a practical engineer, and that, in his opinion, the boiler in question was not sufficient to heat the apartments. However, he was questioned on cross-examination with reference to the accuracy of the engineering information and data given by the plaintiff's experts, and only took issue with them by making the general statement that the boiler was inadequate to heat the premises. He admitted that the apartments for heating purposes required 1,321 square feet. Therefore, since the preponderance of the evidence shows that the boiler had a guaranteed capacity of 1,710 square feet of radiation, it would appear to us that the plaintiff has shown that it had the capacity to properly heat the apartments, which required only 1,321 square feet of radiation.

We may say, in passing, that the defendant did not produce any tenants who lived in the apartments to say that, after the installation of the new boiler, the apartments were cold, and even her own brother, who lives in one of the apartments, did not corroborate her in her statement that the apartments were untenantable because of the lack of heat. We conclude that the second defense is without merit. Hooper v. Dry Hand Mop Co., Inc., 1 La. App. 621; George v. Shreveport Cotton Oil Co., 114 La. 503, 38 So. 432; Pere v. Dalgarn, 3 La. App. 775; Max Barnett Furniture Co. v. Guy, 3 La. App. 239; McCarroll Lumber Co. v. Patenotte, 162 La. 99, 110 So. 102; 35 Cyc., page 436, verbo "Sales."

With reference to the defendant's claim that she should be allowed to deduct the amount that she spent for repairs on account of the alleged defective workmanship and material furnished in connection with the installation of the new boiler, we note that she has failed to plead set-off or to make any claim in reconvention, being content to reserve her right to claim any damages she might have suffered as a result of defective parts and the carelessness of the plaintiff's workmen in installing the new boiler. We do not believe it is necessary for us to pass upon the merit of this claim, because, even if we reached the conclusion that it was meritorious, we would be unable to grant her the relief sought, because the proper pleadings are lacking; but, since she has reserved the right to sue for damages, we believe it only fair to grant that request.

Passing to the final contention of the defendant, to the effect that the evidence shows that plaintiff is not entitled to recover for certain service charges claimed in its petition, because these services were made necessary by defective parts and poor workmanship, it appears that the mechanic who installed and serviced the condensation pump admitted that he put a nail in the connection between the shaft and the pump, instead of a cotter pin. The defendant, her brother, and the janitor, all testified that the pump ceased operation on

several occasions due to the fact that this nail worked out of its position, causing the connection to be severed and the pump to cease operation, which, in turn, caused the heating system to become out of order. While the mechanic states that the nail was stronger than a cotter pin, we do not believe that it is a question of tensile strength as between a cotter pin and a nail, but an issue of whether a cotter pin would be more effective in maintaining a stationary position on machinery where there is vibration. One of the experts testified that he considered it improper workmanship to put a nail in such a connection instead of a cotter pin, which is especially designed to be bent, or turned at the ends, in order to prevent it from becoming dislodged. It would appear to us that it was carelessness on the part of the mechanic to put a nail in this connection, not only originally, but on the several occasions that he serviced the pump. The nail was permitted to remain there until the time the new boiler was installed, when the mechanic properly repaired the connection by placing a steel rivet in it. Therefore, any charges made for services resulting from the connection becoming severed, as a result of the nail falling out of position, should be borne by the plaintiff, as it resulted from the furnishing of an improper part and poor workmanship, which amounted to carelessness on plaintiff's part. These items amount to $23.96, and therefore are disallowed.

For the reasons assigned, the judgment appealed from is amended by reducing the amount thereof from the sum of $641.02 to the sum of $617.06, and reserving defendant's right to sue for the alleged amounts which she claims to have spent on account of defective parts and workmanship. As thus amended, the judgment is affirmed; costs of this appeal to be borne by appellee.